UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

SANDRA MARTIN-THOMAS,

                         Plaintiff,

                                              **DECISION AND ORDER**

                                              09-CV-6375T

                    v.

ERIC SHINSEKI, Secretary, Department of
Veterans Affairs

                         Defendant.

_____

## INTRODUCTION

    Plaintiff, Sandra Martin-Thomas ("Plaintiff"), brings this
action pursuant to Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e *et seq.* and 42 U.S.C. § 1981, alleging race-based
discrimination in the form of a hostile work environment and
retaliation against, Eric Shinseki, Secretary of the Department of
Veterans Affairs ("Defendant"), based on her employment at the
Buffalo VA Medical Center ("Buffalo VA").[1] Defendant moves for
summary judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Rule 56"), contending that Plaintiff has not produced
sufficient evidence of retaliation or a hostile work environment
such that a reasonable jury could find in her favor.  Plaintiff
opposes the motion, contending that there are material issues of

_____

    [1]Pursuant to a Stipulation from the parties and an Order from this Court, Plaintiff's claims
made pursuant to 42 U.S.C. § 1981 were dismissed with prejudice, and all of Plaintiff's claims
against Carlos Li and Miguel Rainstein in their individual capacities were dismissed with
prejudice.  <u>See</u> Docket No. 17.

fact which preclude summary judgment. For the reasons discussed herein, the Court grants in part and denies in part Defendant's motion for summary judgment.

**BACKGROUND**

The following facts are taken from the entire record, inlcuding parties' submissions pursuant to Local Rule 56(a), and are not in dispute unless otherwise noted. (Docket Nos. 26-3, 30-1.)

Plaintiff, a black female of Caribbean descent, was first employed by the Buffalo VA in June 2001 as a floating secretary and as an Administrative Support Assistant to the Cardiothoracic Surgical at the Buffalo VA. In March 2008, Martin-Thomas transferred to the Research and Development Department of the Buffalo VA, where she worked as a secretary until her employment was terminated in September 2009.

Carlos Li, M.D. ("Dr. Li") has served as Chief of Cardiothoracic Surgical Service at the Buffalo VA fom 2000 to the present. Dr. Li was Plaintiff's supervisor between the time she was hired into the Cardiothoracic Surgical Service until she transferred to the Research Department in March 2008. During the relevant time period, the Buffalo VA's Cardiothoracic Surgical Service also employed surgeons Dr. Mark Awolesi ("Dr. Awolesi") and Dr. Hwei-Kang Hsu ("Dr. Hsu"). Miguel Rainstein, M.D. ("Dr. Rainstein") served as Chief of Surgery at the Buffalo VA

beginning in 2005.  In this position, Dr. Rainstein supervised the Cardiothoracic Surgical Service.

<u>Plaintiff's Hostile Work Environment Claims</u>

Plaintiff alleges that Dr. Li "made racially motivated and derogatory comments directed towards [herself], as well as other VA employees of African American descent, including...Dr. Awolesi." Affidavit of Sandra Martin-Thomas (hereinafter "Martin-Thomas Aff."), Docket No 30-3,  at ¶4.  Plaintiff claims this created an "unabated hostile environment based on race." Plaintiff's Second Amended Complaint (Docket No. 12).  Plaintiff also alleges that she suffered retaliation at various times during her tenure at the Buffalo VA for complaining of discrimination by Li. <u>See</u> <u>e.g.</u>, Martin-Thomas Aff. at ¶¶ 22, 24, 32, 37, 46, 61, 63.

Plaintiff testified at her deposition that, she had a respectable working relationship with Dr. Li during her first years at the Buffalo VA. Deposition Transcript of Sandra Martin-Thomas (hereinafter "Martin-Thomas Dep.") at pg. 19.  According to Li, he and Plaintiff worked well together until December 2007. Deposition Transcript of Carlos Li (hereinafter "Li Dep.") at pg. 134.

Plaintiff alleges that four incidents occurring between 2005 and 2007 created a racially hostile work environment.  First, in August of 2005, Dr. Li called Dr. Awolesi, a Nigerian native, to the bedside of an emaciated Caucasian patient being treated in the intensive care unit at the Buffalo VA and asked him if the patient

reminded him of "his people" from Nigeria. Plaintiff was not present for the comment, but she was told about the comment later by Dr. Awolesi. Second, in August of 2005, the Cardiothoracic Surgical staff, including Plaintiff, was gathered in a conference room preparing to watch a training video. On the television, news footage of people looting in the aftermath of Hurricane Katrina played. Dr. Awolesi made a comment that he was interested in going to New Orleans "to help." Dr Li joked, "Why, you want to go there and loot?" Martin-Thomas Dep. at pg. 34. Third, in April 2007, in the backdrop of the radio host Don Imus' infamous use of the term "nappy headed hos," Dr. Li told a related joke following the death of singer Don Ho in which he referred to Ho's large number of grandchildren as "nappy bottomed Hos." Fourth, between March 2007 and December 2007, Dr. Li placed a toy monkey attached to a string on a Mylar balloon on his office door at the Buffalo VA. Plaintiff alleges that the stuffed animal attached to the door was a representation of people of African American descent and was attached to the door in a way that made the monkey looked "lynched."

Dr. Li asserts that he attached the monkey to the door during an office move, where the Cardiothoracic Surgical Service was changing to new offices. Dr. Li claims that the monkey was attached to the door to signify that he had chosen that specific office, because he was not present when others in the

4

Cardiothoracic Surgical Service were going to be moving into the offices. The monkey had been given to him by a co-worker, and the balloon used to attach the monkey to the door, which read "To Our Fearless Leader Happy Bosses Day," was a gift to him from Plaintiff. He believed that the monkey represented himself, and hanging it on the door signified that it was his office. Dr. Li testified that he did not associate negative racial connotations with monkeys, nor was he aware at that time that the monkey could be seen as a derogatory symbol for African American people. Li Dep. at pg. 115.

Plaintiff testified at her deposition that Dr. Li never articulated to her any association between African Americans and monkeys, Martin-Thomas Dep. at pg. 53, nor did he make any comment with regard to race at all in relationship to the display on his door. Martin-Thomas Dep. at pg. 53-54.

When asked at her deposition why she believed that Dr. Li intended to place the monkey on his door as a symbol of a hanged African American instead of as a symbol that the office was his office, Plaintiff responded, "Because if he has got all these stuffed animals, he is Chinese, he should have just put his panda bear" on the door. Martin-Thomas Dep. at pg. 51. When asked for any other reasons to believe that Dr. Li displayed the stuffed monkey as an intentionally racist symbol, Plaintiff responded that he had already made racial remarks, like the looting remark, the

"nappy bottomed Hos" remark, and the remark about the emaciated patient. Martin-Thomas Dep. at pg. 53-54.

The stuffed monkey was attached to the door for many months without Plaintiff or any other employees making a complaint to Li or anyone else at the Buffalo VA. Plaintiff now claims in her affidavit that she complained to Dr. Li and to the Human Resources Manager of the Buffalo VA "shortly" after the monkey was attached to the door. Martin-Thomas Aff. at ¶20. She also claims in her affidavit that "In December 2007, the lynched monkey was finally removed from Dr. Li's office door after multiple complaints regarding the same." Martin-Thomas Aff. at ¶21. Both of these statements from Plaintiff's affidavit flatly contradict her own deposition testimony. Martin-Thomas Dep. at pg. 54-60.

When asked when she spoke with the Human Resources Manager about the stuffed animal display, Plaintiff responded, "I believe it was the same day that I mentioned to Dr. Li about the monkey on the door." Martin-Thomas Dep. at pg. 55. When asked if she talked to Dr. Li first, before talking to anyone in Human Resources, Plaintiff responded "Yes." *Id*. When asked how long the monkey had been on the door before she raised the issue with Dr. Li, she responded, "four or five months." *Id*. Plaintiff then testified that as soon as she raised the issue of the stuffed monkey being on the door, "[Dr. Li] went and took it off the door and snatched it off the door and put it in the trash." Martin-Thomas Dep. at

pg. 57. She confirmed that she only talked to the Human Resources Manager after she complained to Dr. Li. Martin-Thomas Dep. at pg. 58-59.  She explained, "The reason why I also had to raise the issue with [Human Resources] because I had an issue with Dr. Li about my evaluation, and so that is the reason why I raised [the issue with the monkey]." Plaintiff testified that she was not "even going to raise the [stuffed animal] issue with [Dr. Li]" until "he told [her] that [she] was causing a hostile environment in the department." Martin-Thomas Dep. at pg. 57.

This Court also notes, however, that when discussing her retaliation claims later in her deposition, although changing her mind several times, Plaintiff stated that the stuffed monkey complaint happened before the evaluation. Martin-Thomas Dep. at pg. 84-87.

Plaintiff's Unlawful Retaliation Claims

Defendant asserts that when Jackie Clifford ("Clifford") became the Buffalo VA's Medical Care Line Manager in September 2007, she enforced higher standards in evaluating employee performance.  Accordingly, Defendant asserts that the arrival of Clifford as Medical Care Line Manager changed Dr. Li's management approach.  Clifford prompted Buffalo VA managers, and Dr. Li specifically, to be more cognizant of employee's timeliness in maintaining their work schedules including Plaintiff's.  Clifford

7

advised managers that employees who come to work every day and do their job 100 percent of the time are "fully successful."

Plaintiff claims in her affidavit that "at no time did the guidelines...change in the evaluation process to [her] knowledge-with the exceptions of [her] making multiple complaints of racial harassment. Martin-Thomas Aff. at ¶ 39. Plaintiff introduces no evidentiary support for this claim, other than her deposition testimony. Martin-Thomas Dep. at pg. 100-01.

On December 7, 2007, Plaintiff received her 2007 performance Appraisal. The rating was performed by Dr. Rainstein, approved by Clifford, with input provided by Dr. Li. The appraisal rated Plaintiff "fully successful" overall. Plaintiff received a rating of "outstanding" in three elements of her job: Administrative Support, Support for Clerical Service, and Quality Improvement. She received a rating of "Fully successful" for the category of Report and Control.

The comments section of Plaintiff's 2007 Performance Appraisal was complimentary of her dedication and commitment to patients, but it noted that Plaintiff had occasional unprofessional outbursts that "clouded office efficiency." Declaration Kathryn Smith("Smith Decl.") (Dkt #26-2), Exhibit ("Ex.") 5. Dr. Li was responsible for contributing the comments in the appraisal. Dr. Li claims that he based his outburst comments on events reported to him during the evaluation period. In particular, the Chief of Cardiac Catheter

Laboratories at the Buffalo VA had reported to him that Plaintiff was rude when he called for patient information. Thereafter, he refused to call the Cardiothoracic Surgical Service for the information.

Additionally, the VA Administrative Officer reported to Dr. Li in February of 2007 that Plaintiff had hung up on him more than once when they discussed the upcoming office move. Smith Decl., Ex. 6.

In another incident in September 2007, a co-worker sent an e-mail to Clifford describing an incident between Dr. Li and Plaintiff in which Plaintiff became very upset and angry when Dr. Li asked her to turn down the volume on her radio while he was on a telephone call with a patient. Smith Decl., Ex. 25. Dr. Li claims that, consistent with Clifford's direction in conducting employee evaluations, he documented his concerns about Plaintiff's interactions with staff in her Performance Appraisal even though he thought she did well in other aspects of her job.

Plaintiff claims that all of these reports are contested because, as she states in her affidavit "she was falsely accused of having 'unprofessional outbursts that cloud the efficiency of the office.'" Martin-Thomas Aff. at ¶ 38.

After receiving the evaluation, Plaintiff contacted an Equal Employment Opportunity counselor on February 15, 2008 and filed a

formal Equal Employment Opportunity complaint on March 4, 2008, as a result of her Performance Appraisal.

Dr. Li testified that after Plaintiff received the performance evaluation, she became very difficult to work with, and that she was very angry. Deposition (EEO) Transcript of Carlos Li (hereinafter "Li EEO Dep.") at pg. 24-25.

In January 2008, the Buffalo VA held a CREW (Civility Respect Engaged Workforce) training for the Cardiothoracic Surgical Service employees. Despite her complaints about her workplace, Plaintiff did not attend the training. She testified at her deposition that she asked Dr. Li if the counseling was mandatory, and he responded that she could not be mandated to go. Because she was not forced to attend, Plaintiff decided not to attend the CREW training. Martin-Thomas Dep. at pg. 104.

On or about January 9, 2008, Dr. Li learned that Plaintiff asked a co-worker whether she had problems with him. Li EEO Dep. at pg. 28; see Smith Decl., Ex. 7. When the co-worker said no, Plaintiff responded that she had nothing else to say to the co-worker except that Dr. Li was crazy. Plaintiff also described Dr. Li as mentally imbalanced and crazy to other employees of the Buffalo VA. Smith Decl., Ex. 8-10.

Thereafter, Dr. Li informed Plaintiff that in the future he would handle his own patient scheduling, correspondence, telephone calls, cardiac surgery reports, and other administrative tasks.

On March 14, 2008, Clifford and Dr. Rainstein called a meeting with Plaintiff to discuss expanding her work to other medical services at the Buffalo VA that needed administrative support. At the meeting, Plaintiff complained that the situation in the Cardiothoracic Surgical Service was a hostile environment, and that Clifford needed to do something about it. Plaintiff explained that Dr. Li and Dr. Awolesi were not getting along and that she was in the middle of a very stressful work environment. Clifford decided that Plaintiff should not be working in an environment that she claimed was hostile, so they discussed other available administrative positions at the Buffalo VA.

In March 2008, Plaintiff applied for a vacancy in the Buffalo VA Research and Development Department, was interviewed for the position, and was ultimately given the job. Plaintiff's move to the Research Department was a lateral move, resulting in no loss of pay. Her previous position as a secretary for the Cardiothoracic Surgical Service was never filled due to a decreasing caseload.

Defendant asserts that Plaintiff was a "very poor" employee in the Research Department. Deposition Transcript of Miguel Rainstein (hereinafter "Rainstein Dep.") at pg. 153. Managers in the Research and Development Department reported to Dr. Rainstein that Plaintiff would not listen, would not answer phones, and was not performing her job duties. Id.

Plaintiff claims in her affidavit that she "never had any altercations or acted unprofessional in any manner," "never had any outburst at work at all during [her] entire tenure," and "was falsely accused of having anger management issues and performance issues," Martin-Thomas Aff. at ¶¶ 40-41, 45.

On March 31, 2009, Plaintiff was reprimanded by the Associate Chief of Staff for the Buffalo VA's Research and Development Office for inappropriate behavior and for making inappropriate statements to a supervisor. Defendant alleges that Plaintiff was reprimanded because she told a Buffalo VA research investigator that she had "had it" with an inventory they were working on together. Smith Decl., Ex. 15. When Plaintiff's supervisor tried to speak to her about the inventory, Plaintiff responded by saying, <u>inter</u> <u>alia</u>, that she was not a maid or servant, that she was "a black woman." <u>Id</u>.

Plaintiff claims in her affidavit that she "was falsely reprimanded" over the incident. Martin-Thomas Aff. at ¶ 58.

On May 29, 2009, Plaintiff was ordered by Dr. Rainstein to serve a three day suspension without pay for failing to follow her supervisor's instructions to meet with her. Smith Decl., Ex. 17.

Plaintiff claims in her affidavit that she "was wrongfully suspended...in retaliation for engaging in protected activity." Martin-Thomas Aff. at ¶ 61.

On July 31, 2009, Dr. Rainstein informed Plaintiff that he proposed removing her from her job. The reasons for her removal were: 1) On June 29, Plaintiff's supervisor asked her to review a list of phone calls and identify which calls were personal. Plaintiff refused. 2)On July 8, Plaintiff's supervisor gave her written instructions to review a list of her phone calls and identify which calls were personal. Plaintiff again refused. 3)On May 1, Plaintiff said that Dr. Rainstein's wife did not trust him, "why should [she]?" 4)On June 2, Plaintiff called Dr. Rainstein a "bastard." 5) On June 4, Plaintiff used the term "nigger war." 6) On June 18, Plaintiff referred to the Buffalo VA as being like Nazi Germany, and she called Dr. Rainstein "Hitler." 7)On July 8, referencing her direct supervisor's medical history involving brain surgery, Plaintiff said that her supervisor's brain was not right and that her supervisor could not do her job but for Plaintiff reminding her of things. 8)An audit of Plaintiff's phone usage between December 2008 and June 2009 revealed that she had made 340 long distance calls on her work phone, 278 of which were not related to her VA duties. 9)An audit of Plaintiff's phone usage between December 2008 and June 2009 revealed that she had made 2285 local calls on her work phone, 1754 of which were not related to her VA duties. Smith Decl., Ex. 19.

The VA's phone policy limits the use of personal telephone calls to instances where an employee is injured on the job;

required to work unscheduled overtime; traveling on government business; brief calls to family to check on their well being; breif calls that can be made only during the day, such as calls to physicians and government agencies; and brief calls to arrange for auto or home repair. Smith Decl., Ex. 20 (Network Telecommunications Policy).

William Feeley, the Director of the Buffalo VA Medical Center reviewed Dr. Rainstein's proposed removal of Plaintiff and concurred. Feeley documented a *Douglas* factor analysis[2] of the facts which led to Plaintiff's proposed removal and concluded that despite her seven years of service to the VA, her conduct warranted removal. Smith Decl., Ex. 21. Feeley noted that Plaintiff was on notice that her conduct was not appropriate and that she had been subject to two disciplinary actions in the previous five months. He also noted that her conduct demonstrated that she was unable to follow directions, was unreliable, and did not treat people with dignity or respect. Feeley concluded that her unwillingness to take responsibility for her actions made her rehabilitation unlikely and that there were no appropriate alternative sanctions other than her removal.

---

[2] Douglas Factor analyses arise from Douglas v. Veterans Administration, a case before the Merit Systems Protection Board, that established a federal agency's burden to show the reasonableness of an adverse employment action that it will take by showing that appropriate consideration was given to each of the twelve factors set forth in the decision.

Plaintiff claims in her affidavit that "the reason(s), or lack thereof, that were provided to [her] for [her] termination were false and misleading." Martin-Thomas Aff. at ¶ 66.

Accordingly, on Septmeber 1, 2009, Plaintiff was removed from her position at the Buffalo VA.

## **DISCUSSION**

### Defendant's Motion to Strike

Defendant moves this Court to strike Exhibit A to Plaintiff's Response to Defendant's Motion for Summary Judgment. Defendant claims that submitting the full transcript from Plaintiff's deposition does not comply with Rule 56(a)(4) of the Local Rules of Civil Procedure, that relevant deposition testimony should be filed as an appendix to the party's statement of facts. I find that all of Plaintiff's deposition testimony is relevant, not just those parts cited in Plaintiff's Response. Accordingly, I deny Defendant's motion to strike.

### Defendant's Motion for Summary Judgment

Pursuant to Rule 56, a court shall grant a motion for summary judgment if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(a). Once the movant has met this burden, the burden shifts to the nonmovant who must "come forward with evidence to allow a reasonable jury to find in his favor" on each of the elements of his prima facie case. See

Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir.2001); Celotex Corp. v. Catrett, 477 U.S. 317, 325-27 (1986). The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Celotex Corp., 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." See Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776 (2007).

## A. Hostile Work Environment

A plaintiff alleging a claim for a hostile work environment must establish "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). The test to determine whether a plaintiff was the victim of a hostile work environment "has objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive." Alfano, 294 F.3d at 374 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). The Court must look at the totality of the circumstances, including

16

the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether such conduct unreasonably interferes with the plaintiff's work performance. See Harris 510 U.S. at 23.

After reviewing the record in its entirety, and considering the facts in the light most favorable to the Plaintiff, this Court finds that there are material issues of fact as to whether Plaintiff was subjected to a hostile work environment. Specifically, this Court finds that a reasonable jury could conclude that Dr. Li's actions, including hanging on his office door a stuffed monkey with a balloon tied around its neck after Plaintiff complained to him about numerous comments that she believed were racially motivated and derogatory, could be sufficient to alter the terms and conditions of Plaintiff's employment and to create an abusive working environment.

This Court specifically notes that there are material issues of fact as to the inferences that can be drawn from the incident involving the monkey and that the facts, viewed in the light most favorable to the Plaintiff, reveal that this incident combined with the other incidents she claims could lead a reasonable jury to conclude that Plaintiff was subjected to a hostile and abusive work environment permeated with discriminatory intimidation, ridicule, and insults. Accordingly, Defendant's motion for summary judgement on Plaintiff's hostile work environment claim is denied.

**B.    Retaliation**

Plaintiff claims that she was unlawfully retaliated against when (1) she received a "fully successful" performance appraisal which contained negative comments about her professionalism, (2) her schedule was more closely "monitored" by Dr. Li, (3) she was informed by Dr. Li that he would no longer give her administrative work, (4) she was transferred to the Buffalo VA's Research and Development Department, and 5) she was disciplined and eventually terminated from her employment.

Plaintiff's retaliation claims are analyzed under the McDonnell Douglas burden-shifting framework. See McDonnell Douglass Corp. v. Green, 411 U.S. 792, 802 (1973). Under this framework, Plaintiff must first establish a prima facie case of discriminatory retaliation by showing: (1) participation in a protected activity known to the Defendant; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006); Holt v. KMI-Continental, 95 F.3d 123, 130 (2d Cir. 1996), cert. denied, 1997 WL 71191 (May 19, 1997); Tomka v. Seiler Corp., 66 F.3d 1295, 1308 (2d Cir. 1995) (citations omitted). Once a plaintiff has established a prima facie case of discrimination, the defendant may then articulate a legitimate, nondiscriminatory rationale for its actions. See Texas Dept. Of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). The burden

18

then shifts back to the plaintiff to demonstrate that the employer's articulated reason is both untrue and a pretext for the true retaliatory motive. <u>See</u> <u>McDonnell-Douglas Corp.</u>, 411 U.S. at 802; <u>see</u> <u>also</u> <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d 87 (2d Cir. 2001).

Even if this Court assumes that Plaintiff has stated a <u>prima facie</u> claim of unlawful retaliation, Defendant has articulated legitimate, non-retaliatory reason for all of the alleged adverse employment actions. Defendant asserts that Plaintiff received a "fully successful" Performance Appraisal and had to maintain a stricter work schedule because when Clifford was hired in September 2007, she ushered in a new standard in management accountability at the Buffalo VA. This included more strictly overseeing employee schedules and holding employees more accountable in the performance of their job duties. Defendant also asserts that there were numerous reports from Plaintiff's co-workers that she was acting "unprofessionally." These complaints were contemplated in Plaintiff's evaluation.

With respect to her job duties being diminished and her job transfer, Dr. Li, specifically, found Plaintiff very angry and difficult to work with after she received her Performance Evaluation that she deemed was "negative." Dr. Li also received numerous complaints that Plaintiff was approaching other staff at the Buffalo VA to tell them that Dr. Li was "crazy" and "mentally

imbalanced." Smith Decl., Ex. 8. Dr Li lost trust in Plaintiff after he received these complaints, and he felt that Plaintiff was blatantly undermining him. Id. Additionally, Dr. Li felt that Plaintiff's continued conflicts and actions "severely hampered" his "obligations as service chief." Id. Plaintiff also told Clifford that the Cardiothoracic Surgical Service had become a very stressful working environment because of the conflict between Dr. Li and Dr. Awolesi. See Pl. Response to Def. Local Rul 56(a)(1) Statement ("Pl. Response") at ¶ 57. Plaintiff complained to Clifford that the ongoing conflict between the doctors created a hostile work environment and that she wanted something done about it. Martin-Thomas Dep. at 109; Smith Decl., Ex. 13. After CREW training and other attempts at resolving the workplace dispute were unsuccessful, Clifford determined that Plaintiff should not be subjected to being forced to work in an environment that Plaintiff described as "stressful" and "hostile."

Defendant asserts that after Plaintiff applied for, interviewed for, and was awarded a job in the Research Department, she was reprimanded numerous times for refusing to perform her job duties. She was also warned numerous times about her inappropriate comments about her supervisors and her unprofessional outbursts. Smith Decl., Ex. 15-17, 19. Plaintiff also had violated the Buffalo VA Telecommunications Policy by making over 2,000 personal phone calls over a 6-month period. Smith Decl., Ex. 18, 20. Then, only

after a review by Feeley was Plaintiff terminated. It is undisputed that Feeley did not know about Plaintiff's Equal Employment Opportunity complaints when he decided that Plaintiff's employment should be terminated. Martin-Thomas Dep. at 140.

Where, as here, a defendant in a retaliation claim has articulated a legitimate, non-retaliatory reason for the adverse action, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." <u>Bundschuh v. Inn on the Lake Hudson Hotels, LLC</u>, 2012 WL 5402303 at *8 (W.D.N.Y. November 5, 2012).

Other than her conclusory allegations that the actions of the Buffalo VA administration were discriminatory and retaliatory, Plaintiff has come forward with no evidence to demonstrate that Defendant's non-discriminatory reasons for the challenged actions are pretextual. Instead, Plaintiff merely offers her own unsubstantiated, subjective belief that the various employment actions were discriminatory and/or retaliatory. Martin-Thomas Aff. at ¶¶ 16, 22, 37, 39, 46, 55, 61, 64, 66. This evidence is insufficient to carry her burden under the <u>McDonnell Douglas</u> test. The Court of Appeals for the Second Circuit has cautioned that "[to] allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all

[discrimination] cases." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985).

Additionally, mere temporal proximity, by itself, is not sufficient to defeat summary judgment in the face of Defendant's proffered legitimate reason. <u>El Sayed v. Hilton Hotels Corp.</u>, 627 F.3d 931 (2d Cir. 2010); <u>Simpson v. N.Y. State Dep't of Civil Serv.</u>, 166 Fed.Appx. 499 (2d Cir. 2006); <u>Pierre v. New York State Dep't of Corr. Servs.</u>, 2009 US Dist LEXIS 51798 (S.D.N.Y. June 1, 2009).

As Plaintiff has not, and cannot, offer any basis other than timing to show that discrimination and retaliation were really the basis for Defendant's employment actions, Plaintiff's unlawful retaliation claims must be dismissed, and Defendant is entitled to summary judgment.

## CONCLUSION

For the reasons set forth herein, Defendant's motion for summary judgment is granted in part and denied in part. Defendant's motion for summary judgement dismissing Plaintiff's claim for retaliation is granted. The Court, however, finds that there are material issues of fact with respect to Plaintiff's claim for a hostile work environment.

**ALL OF THE ABOVE IS SO ORDERED.**

S/Michael A. Telesca
_____

HON. MICHAEL A. TELESCA
United States District Judge

Dated:    April 30, 2013
          Rochester, New York